Nos. 22-16810, 22-16812

IN THE

# United States Court of Appeals for the Ninth Circuit

---

CITY OF OAKLAND, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the Oakland City Attorney Barbara J. Parker; CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Francisco City Attorney Dennis J. Herrera,

*Plaintiffs-Appellees,*

v.

B.P. P.L.C., a public limited company of England and Wales; CHEVRON CORPORATION, a Delaware corporation; CONOCOPHILLIPS COMPANY, a Delaware corporation; EXXON MOBIL CORPORATION, a New Jersey corporation; ROYAL DUTCH SHELL PLC, a public limited company of England and Wales; and DOES 1 through 10,

*Defendants-Appellants.*

---

On Appeal from the United States District Court, Northern District of California, Case Nos. 3:17-cv-06011, 3:17-cv-06012
(The Honorable William H. Alsup)

---

## APPELLANTS' OPENING BRIEF

---

JOSHUA D. DICK
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
(415) 393-8331

THOMAS G. HUNGAR
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 887-3784

THEODORE J. BOUTROUS, JR.
ANDREA E. NEUMAN
WILLIAM E. THOMSON
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
(213) 229-7000
tboutrous@gibsondunn.com

*Counsel for Defendant-Appellant Chevron Corporation.*
[*Additional counsel listed on signature page*]

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants submit the following statement:

BP p.l.c., a publicly traded corporation organized under the laws of England and Wales, has no parent corporation, and there is no publicly held corporation that owns 10% or more of BP p.l.c.'s stock.

Chevron Corporation has no parent corporation, and no publicly held company holds 10% or more of its stock.

ConocoPhillips has no parent corporation, and no publicly held company holds 10% or more of its stock.

ConocoPhillips Company is a wholly owned subsidiary of ConocoPhillips.

Exxon Mobil Corporation has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Shell plc ($f/k/a$ Royal Dutch Shell plc) has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ................................. 4

RELEVANT AUTHORITIES ........................................ 4

ISSUES PRESENTED ................................................... 5

STATEMENT OF THE CASE ....................................... 6

STANDARD OF REVIEW ............................................ 10

SUMMARY OF THE ARGUMENT ............................ 11

ARGUMENT ................................................................ 14

    I.    These Actions Are Removable Under The Federal-Officer-Removal Statute ........................................ 14

        A.    Defendants Acted Under The Direction Of Federal Officers ........................................... 16

            1.    Defendants acted under federal officers to produce and supply specialized fuels for the military ................................................. 18

            2.    Defendants acted under federal officers during World War II ........................................ 27

        B.    Defendants' federal activities "relat[e] to" Plaintiffs' lawsuits ...................................... 34

        C.    Defendants Raise "Colorable Federal Defenses." ........ 41

    II.    These Actions Are Removable Because Plaintiffs' Claims Necessarily Raise Disputed And Substantial Issues Under The First Amendment ................................... 47

    III.   Defendants Preserve Additional Arguments That Plaintiffs' Claims Arise Under Federal Law ........................ 56

CONCLUSION ........................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agyin v. Razmzan,*
    986 F.3d 168 (2d Cir. 2021) ............................................................... 24

*Am. Elec. Power Co., Inc. v. Connecticut,*
    564 U.S. 410 (2011) ............................................................................ 56

*Baker v. Atl. Richfield Co.,*
    962 F.3d 937 (7th Cir. 2020) ...........................15, 18, 19, 24, 25, 34, 40

*Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988) ............................................................................ 43

*BP P.L.C. v. Mayor & City Council of Baltimore,*
    141 S. Ct. 1532 (2021) ......................................................................... 4

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.,*
    797 F.3d 720 (9th Cir. 2015) ............................................................... 43

*Church of Scientology of Cal. v. Adams,*
    584 F.2d 893 (9th Cir. 1978) .......................................................... 52, 53

*City & County of Honolulu v. Sunoco LP,*
    39 F.4th 1101 (9th Cir. 2022) .................2, 6, 14, 17, 33, 42, 43, 52, 57

*City of New York v. Chevron Corp.,*
    993 F.3d 81 (2d Cir. 2021) .................................................................. 39

*City of Milwaukee v. Illinois,*
    451 U.S. 304 (1981) ............................................................................ 56

*City of Oakland v. BP PLC,*
    969 F.3d 895 (9th Cir. 2020) ................................................................ 5

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy,
    Inc.,*
    996 F.3d 243 (4th Cir. 2021) .................................................... 35, 40, 42

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*In re Commonwealth's Mot. to Appoint Counsel*,
  790 F.3d 457 (3d Cir. 2015) ............................................................... 34

*Cnty. of San Mateo v. Chevron Corp.*,
  32 F.4th 733 (9th Cir. 2022) .................................... 2, 6, 24, 25, 26, 52

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010) ............................................................... 29

*Devengoechea v. Bolivarian Repub. of Venezuela*,
  889 F.3d 1213 (11th Cir. 2018) .......................................................... 36

*Durham v. Lockheed Martin Corp.*,
  445 F.3d 1247 (9th Cir. 2006) ............................................................... 6

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  511 F. Supp. 2d 742 (S.D. Tex. 2005) ................................................ 50

*Exxon Mobil Corp. v. United States*,
  2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ........................ 28, 30, 31

*Fry v. Napoleon Cmty. Schs.*,
  137 S. Ct. 743 (2017) .......................................................................... 36

*Gertz v. Boeing Co.*,
  654 F.3d 852 (9th Cir. 2011) ............................................................... 44

*Goncalves v. Rady Child.'s Hosp. San Diego*,
  865 F.3d 1237 (9th Cir. 2017) ....................................................... 14, 26

*Gorran v. Atkins Nutritionals, Inc.*,
  464 F. Supp. 2d 315 (S.D.N.Y. 2006) ................................................ 50

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005) ........................................... 3, 5, 47, 48, 55

*Gully v. First Nat'l Bank*,
  299 U.S. 109 (1936) ...................................................................... 51, 55

iv

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*Gunn v. Minton,*
568 U.S. 251 (2013) .................................................................... 48, 53

*Hustler Mag., Inc. v. Falwell,*
485 U.S. 46 (1988) .............................................................................. 50

*Illinois v. City of Milwaukee,*
406 U.S. 91 (1972) .............................................................................. 56

*Janus v. AFSCME, Council 31,*
138 S. Ct. 2448 (2018) ....................................................................... 54

*Jefferson Cnty. v. Acker,*
527 U.S. 423 (1999) .............................................................. 15, 36, 41

*Jordan v. Nationstar Mortg. LLC,*
781 F.3d 1178 (9th Cir. 2015) .......................................................... 10

*Knievel v. ESPN,*
393 F.3d 1068 (9th Cir. 2005) .......................................................... 52

*Latiolais v. Huntington Ingalls, Inc.,*
951 F.3d 286 (5th Cir. 2020) ...................................................... 25, 34

*Leite v. Crane Co.,*
749 F.3d 1117 (9th Cir. 2014) .................................................... 15, 26

*Lieberman v. Fieger,*
338 F.3d 1076 (9th Cir. 2003) .................................................... 52, 53

*Maryland v. Soper,*
270 U.S. 9 (1926) ............................................................................... 35

*Massachusetts v. EPA,*
549 U.S. 497 (2007) ........................................................................... 46

*McBridge Cotton & Cattle Corp. v. Veneman,*
290 F.3d 973 (9th Cir. 2002) ............................................................ 41

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990)...................................................................... 49

*Minnesota v. Am. Petroleum Inst.*,
--- F.4th ---, 2023 WL 2607545 (8th Cir. May 23, 2023)..................... 42

*Moore v. Elec. Boat Corp.*,
25 F.4th 30 (1st Cir. 2022)........................................... 17, 18

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)................................................................ 49

*In re Nat'l Prescription Opiate Litig.*,
2023 WL 166006 (N.D. Ohio Jan. 12, 2023)....................................... 42

*Nat'l Review, Inc. v. Mann*,
140 S. Ct. 344 (2019)............................................................. 54

*OBB Personenverkehr AG v. Sachs*,
577 U.S. 27 (2015)............................................................... 36

*Ortiz v. Univ. of Med. & Dentistry of N.J.*,
2009 WL 737046 (D.N.J. Mar. 18, 2009)........................................... 51

*Papp v. Fore-Kast Sales Co.*,
842 F.3d 805 (3d Cir. 2016) .................................................... 17

*Phila. Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986)........................................................ 49, 55

*The Prize Cases*,
67 U.S. (2 Black) 635 (1862) .................................................. 22

*Ruppel v. CBS Corp.*,
701 F.3d 1176 (7th Cir. 2012)................................................... 35

*Saldana v. Glenhaven Healthcare LLC*,
27 F.4th 679 (9th Cir. 2022) .................................................. 14

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*Sawyer v. Foster Wheeler LLC*,
860 F.3d 249 (4th Cir. 2017) ............................................................... 34

*Schmitt v. War Emer. Pipelines, Inc.*,
175 F.2d 335 (8th Cir. 1949) ............................................................... 32

*Schmitt v. War Emer. Pipelines, Inc.*,
72 F. Supp. 156 (E.D. Ark. 1947) ....................................................... 32

*Shell Oil Co. v. United States*,
751 F.3d 1282 (Fed. Cir. 2014) .......................................................... 30

*Snyder v. Phelps*,
580 F.3d 206 (4th Cir. 2009) ............................................................... 50

*Time Inc. v. Hill*,
385 U.S. 374 (1967) ............................................................................. 50

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
898 F.2d 914 (3d Cir. 1990) ................................................................ 50

*United States v. Shell Oil Co.*,
294 F.3d 1045 (9th Cir. 2002) ............................................................. 28

*W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*,
23 F.4th 288 (4th Cir. 2022) ............................................................... 22

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007) .............................................. 16, 17, 23, 24, 26, 33

*Willingham v. Morgan*,
395 U.S. 402 (1969) ............................................................................. 15

*Winters v. Diamond Shamrock Chemical Co.*,
149 F.3d 387 (5th Cir. 1998) .............................................................. 25

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

**Constitutional Provisions**

U.S. Const., art. I, § 8, cl. 17 ....................................................... 6

**Statutes**

28 U.S.C. § 1442(a) ..................................................................... 11

28 U.S.C. § 1442(a)(1) ............................................................ 14, 34

28 U.S.C. § 1446(b)(2)(B) ............................................................. 4

43 U.S.C. § 1349(b)(1) ............................................................ 6, 56

**Regulations**

8 Fed. Reg. 1,068 (Jan. 20, 1943) ............................................... 32

8 Fed. Reg. 13,343 (Sept. 30, 1943) ........................................... 32

**Other Authorities**

Hyung Sam Park et al., *Framing Climate Policy Debates:
    Science, Network, and U.S. Congress, 1976-2007* (2010) .................. 45

National Science Foundation: Review of First Eleven Months
    of International Geophysical Year: Hearings Before the
    Subcomm. of the Comm. on Appropriations, 85th Cong. 75
    (1958) .................................................................................. 45

President Lyndon Baines Johnson, *Special Message to the
    Congress of Conservation and Restoration of Natural
    Beauty*, Feb. 8, 1965, The American Presidency Project .................. 46

Removal Clarification Act of 2011, Pub. L. No. 112-51,
    125 Stat. 545 ......................................................................... 34

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

Second Supplemental Appropriation Bill: Hearing on H. Doc.
330 Before the Subcomm. of the Comm. on
Appropriations, 84th Cong. 472–73 (1956) ....................................... 45

Serhii Plokhy, *Nuclear Folly: A History of the Cuban Missile
Crisis* (2021) ...................................................................................... 22

U.S. Petroleum Administration for War, *Petroleum in War
and Peace: Papers Presented by the Petroleum
Administration for War Before the United States Senate
Special Committee to Investigate Petroleum Resources*
(1945) ................................................................................................... 29

The White House, *Restoring the Quality of Our Environment:
Report of the Environmental Pollution Panel*, President's
Sci. Advisory Comm. (1965) ............................................................... 46

**INTRODUCTION**

Plaintiffs, the City of Oakland and the City and County of San Francisco, filed these two consolidated cases in California state court, seeking to use California state nuisance law to impose liability on selected energy companies for physical harms allegedly attributable to the effects of global climate change stemming from the cumulative impact of the worldwide production, promotion, sale, and use of oil and gas dating back more than a century. Defendants removed the cases to federal district court on various grounds, and the district court ordered the cases remanded to state court for lack of federal jurisdiction, concluding that it was bound by this Court's precedents to reject Defendants' arguments for removal.

In the past few years, several courts—including this one—have considered similar lawsuits presenting related jurisdictional issues, and several of those cases are pending on petitions for writs of certiorari before the Supreme Court, which has called for and received the views of the Solicitor General of the United States.[1] This Court decided some of the

---

[1] *See Suncor Energy (U.S.A.) Inc. v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, No. 21-1550 (U.S.); *BP p.l.c. v. Mayor & City Council of Baltimore*,

issues presented in this appeal in *County of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022) ("*San Mateo II*"), and *City & County of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022) ("*Honolulu II*"), and Defendants-Appellants respectfully preserve their arguments on certain of those issues for further review.

This appeal, however, presents several arguments that neither *San Mateo II* nor *Honolulu II* confronted. Plaintiffs allege that climate change is caused by Defendants' global production, promotion, and sale of fossil fuels. The expanded record in these cases demonstrates that a significant portion of Defendants' production and sale activities, including the production of large amounts of specialized, noncommercial grade fuels for the U.S. military, and extensive federally directed activities during World War II, were undertaken at the direction of federal officers. Those activities therefore necessarily relate to Plaintiffs' lawsuits and al-

---

No. 22-361 (U.S.); *Chevron Corp. v. San Mateo Cnty.*, No. 22-495 (U.S.); *Sunoco LP v. City & Cnty. of Honolulu*, No. 22-523 (U.S.); *Shell Oil Prods. Co. v. Rhode Island*, No. 22-524 (U.S.); *Chevron Corp. v. City of Hoboken*, No. 22-821 (U.S.). The Office of the Solicitor General filed its brief in *Suncor* on March 16, 2023.

2

leged injuries, thereby allowing removal under the federal-officer-removal statute.  This evidence was not before the *San Mateo II* Court and not considered by the *Honolulu II* Court.

Additionally, to the extent that Plaintiffs' claims involve Defendants' speech by challenging alleged misrepresentations, they are removable under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), another argument that this Court has not yet addressed.  To the extent that Plaintiffs' complaints identify alleged misrepresentations as a step in the causal chain leading to their claimed physical injuries, Plaintiffs cannot prevail without satisfying their burden of establishing the prerequisites to liability mandated by the First Amendment.  Plaintiffs' claims therefore necessarily incorporate affirmative federal constitutional elements imposed by the First Amendment, making them removable under *Grable* given the substantial issues raised by this case.

This Court should reverse the district court's order remanding the cases to state court.

## JURISDICTIONAL STATEMENT

Defendants timely removed both the *Oakland* and *San Francisco* actions to the U.S. District Court for the Northern District of California on October 20, 2017. 28 U.S.C. § 1446(b)(2)(B); 5-ER-1065; 5-ER-1163. In their notices of removal, Defendants asserted jurisdiction under 28 U.S.C. §§ 1331, 1334, 1441(a), 1442, 1452, and 1367(a), and 43 U.S.C. § 1349(b).

On October 24, 2022, the district court granted Plaintiffs' renewed motions to remand, 1-ER-16, and on November 21, 2022, Defendants timely filed notices of appeal under 28 U.S.C. §§ 1291 and 1447(d). 6-ER-1308; 6-ER-1317.

This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1447(d) to review the district court's entire remand order. *See BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021).

## RELEVANT AUTHORITIES

All relevant statutory authorities are reproduced in the addendum to this brief.

## ISSUES PRESENTED

**I.**     Whether the district court had jurisdiction under 28 U.S.C. § 1442(a)(1) because Plaintiffs' public nuisance claims are "for or relating to" purported injuries allegedly caused by emissions from the use of oil and gas, a substantial amount of which was produced at the direction of the federal government.  5-ER-1057–61; 5-ER-1155–59.

**II.**     Whether the district court had removal jurisdiction under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), for claims raising substantial and disputed federal questions, given that Plaintiffs' claims include federal constitutional elements, to the extent that they challenge alleged misrepresentations. 5-ER-1044–50; 5-ER-1142–48.

**III.**     Whether the district court had subject-matter jurisdiction because Plaintiffs' claims for purported injuries allegedly stemming from global climate change necessarily and exclusively arise under federal law.  5-ER-1038–44; 5-ER-1136–42.[2]

---

[2] This issue was decided by *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020), but Defendants respectfully preserve it for further review.

**IV.**    Whether Plaintiffs' claims "aris[e] out of, or in connection with" Defendants' operations on the Outer Continental Shelf ("OCS"), 43 U.S.C. § 1349(b)(1).  5-ER-1054–57; 5-ER-1152–55.[3]

**V.**    Whether Plaintiffs' claims stem from Defendants' acts arising on federal enclaves, U.S. Const., art. I, § 8, cl. 17; *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006).  5-ER-1061–63; 5-ER-1159–61.[4]

## STATEMENT OF THE CASE

Plaintiffs, the City of Oakland and the City and County of San Francisco, each filed suit in state court, alleging that five energy companies' "production and promotion of massive quantities of fossil fuels . . . is a direct and proximate cause of [Plaintiffs'] injuries and threatened injuries" from "global warming."  5-ER-1105 ¶ 95; 6-ER-1289–90 ¶ 96. According to Plaintiffs, Defendants' extraction, production, promotion,

---

[3] This issue was decided by *San Mateo II*, 32 F.4th at 751–55, and *Honolulu II*, 39 F.4th at 1108–09, but Defendants respectfully preserve it for further review.

[4] This issue was decided by *San Mateo II*, 32 F.4th at 748–51, and *Honolulu II*, 39 F.4th at 1111–12, but Defendants respectfully preserve it for further review.

and sale of their oil and gas have created "inevitable emissions of green-house gases" that have "result[ed] in dangerous levels of global warming with grave harms for coastal cities like [Plaintiffs]." 5-ER-1105 ¶ 95; 6-ER-1290 ¶ 96. Plaintiffs allege that these environmental changes have led to "accelerated sea level rise," which "has and will continue to injure public property . . . through increased inundation, storm surges, and flooding and which threatens the safety and lives of [Plaintiffs'] residents," requiring Plaintiffs to "incur extensive costs to protect public and private property" from such damage and "to adapt to climate change." 5-ER-1106 ¶¶ 96, 98; 6-ER-1290–91 ¶¶ 97, 99.

Plaintiffs assert a single cause of action for public nuisance. 5-ER-1105–06 ¶¶ 93–98; 6-ER-1289–91 ¶¶ 94–99. Plaintiffs demand, among other things, equitable relief to abate the alleged nuisances and help Plaintiffs adapt to global warming impacts, attorneys' fees, and costs and expenses. 5-ER-1107; 6-ER-1291.

A substantial portion of the relevant conduct alleged by Plaintiffs occurred outside of California, with a significant portion occurring in foreign countries or on federal land, including the OCS. 5-ER-1078–81 ¶¶ 15–29; 6-ER-1258–61 ¶¶ 15–29. Certain Defendants also engaged in

extensive fossil-fuel production at the direction of federal officers. *See*, *e.g.*, 5-ER-1058–60; 5-ER-1156–58.

Defendants' notices of removal raised various grounds for removal, including that Plaintiffs' complaints: (1) allege actions taken pursuant to a federal officer's directions; (2) "raise[] disputed and substantial federal questions"; (3) arise under federal common law because federal law necessarily and exclusively governs claims for interstate and international pollution; (4) warrant federal jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"); and (5) stem from acts arising on federal enclaves. *See* 5-ER-1038–63; 5-ER-1136–61.

The district court originally denied Plaintiffs' motions to remand, holding that Plaintiffs' nuisance claims "are necessarily governed by federal common law." 5-ER-1026. The district court then dismissed Plaintiffs' complaints for failure to state a claim. 4-ER-872–73. On appeal, this Court concluded that Plaintiffs' state-law claim for public nuisance does not arise under federal law because neither of two exceptions to the well-pleaded complaint rule applied to Plaintiffs' claims. 4-ER-849. The Court vacated the district court's decision and remanded the case for the district court to consider alternative bases for subject-matter jurisdiction.

8

4-ER-836. On remand, the district court granted Plaintiffs' renewed motion to remand to state court.[5] The court concluded that it was bound by *San Mateo II* and *Honolulu II* to reject four remaining grounds for removal: federal officer removal, *Grable* removal premised on the First Amendment, jurisdiction under OCSLA, and federal enclave jurisdiction.

As for federal officer removal, the district court addressed two categories of activities that this Court has not yet specifically addressed— specialized fuel contracts with the federal government and Defendants' World War II activities—and concluded that Defendants had not satisfied the "acting under" prong of the statute's nexus requirement. 1-ER-11–15. Noting that if it were writing on a "clean slate," Defendants' evidence of World War II activities would meet the statutory standard for removal, the court nevertheless determined that *San Mateo II* precluded

_____

[5] The district court previously concluded that it lacked personal jurisdiction over BP p.l.c., ConocoPhillips, Exxon Mobil Corporation, and Shell plc (*f/k/a* Royal Dutch Shell plc). 4-ER-839. In granting Plaintiffs' renewed motion to remand, the district court vacated the personal jurisdiction dismissal order based on "comity considerations." 1-ER-15–16. In joining this brief, BP p.l.c., ConocoPhillips, Exxon Mobil Corporation, and Shell plc do not waive and expressly preserve their objections to personal jurisdiction; if this Court reverses, the personal jurisdiction dismissal order should be reinstated.

it from so finding.  1-ER-14.  The court also concluded that *San Mateo II* "constrained" it to reject the specialized-fuel contracts as a ground for removal.  1-ER-14.

Respecting OCSLA jurisdiction and federal enclave jurisdiction, the district court concluded that it was bound by *San Mateo II* and *Honolulu II* to reject Defendants' argument because Plaintiffs' allegations similarly reference "promotion."  1-ER-4–8.  Finally, the district court rejected Defendants' *Grable* argument, ruling that the First Amendment limitations on state-law causes of action involving speech do not convert those causes of action into federal ones.  1-ER-9–11.

On November 21, 2022, Defendants timely noticed their appeals.  6-ER-1308; 6-ER-1317.

## STANDARD OF REVIEW

This Court "review[s] whether an action was properly remanded to the state court from which it was removed *de novo*."  *Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178, 1181 (9th Cir. 2015).

## SUMMARY OF THE ARGUMENT

**I.** The district court erred in holding that Plaintiffs' claims were not removable under the federal-officer-removal statute, 28 U.S.C. § 1442(a).

The district court mistakenly believed that remand was required by this Court's federal-officer-removal holdings in *San Mateo II* and *Honolulu II*. But this case presents evidence of federally directed activity that was not before the *San Mateo II* Court and not addressed by the *Honolulu II* Court. Whether Defendants properly invoked the federal-officer-removal statute to remove this case is thus an open question in this Circuit. The answer is yes.

Defendants have presented extensive evidence of two categories of activities demonstrating that they have extracted and produced oil and gas under the direction of federal officers—a requirement for federal officer removal. First, for decades, Defendants (or their affiliates) have produced highly specialized fuels for the U.S. military. These fuels are not off-the-shelf consumer products. Instead, Defendants custom-manufacture them in conformity with exacting government specifications to meet the military's unique needs.

11

Second, during World War II, Defendants (or their predecessors) operated under the effective control of the federal government to fuel the Allied war effort. The government controlled when, where, and how Defendants extracted and produced oil and gas, and Defendants operated many oil and gas facilities on the government's behalf.

In both their wartime service and their production of specialized fuels, Defendants fulfilled essential tasks that the government itself would have otherwise been forced to undertake. Thus, these activities occurred under federal officers. The district court erred in ruling otherwise.

Plaintiffs' public-nuisance claims "relate" to these federally directed activities—another requirement for federal officer removal. Plaintiffs, by alleging injuries from global climate change supposedly resulting from Defendants' products, seek to hold Defendants liable for their extraction, production, and sale of oil and gas. This necessarily includes Defendants' activities undertaken at the behest of federal officers.

Lastly, Defendants also have raised several colorable federal defenses, including government-contractor immunity. Defendants have therefore satisfied all of the requirements for removal under the federal-

officer-removal statute, which the Supreme Court has described as "broad," and which this Court has recognized should be "liberally construed" *in favor of* removal.

**II.** Plaintiffs' claims also raise substantial, disputed issues of federal law, making removal appropriate under *Grable*. To the extent that Plaintiffs' claims involve alleged misrepresentations about the effect of Defendants' oil-and-gas products, those claims arise under federal law for purposes of *Grable* jurisdiction because they target constitutionally protected speech and therefore necessarily require Plaintiffs to prove affirmative federal-law elements imposed by the First Amendment. Plaintiffs' lawsuits also uniquely implicate matters of significant public concern, which go to the core of the First Amendment's protections. Plaintiffs' claims thus include substantial federal questions that provide the basis for *Grable* removal.

**III.** Finally, Defendants respectfully preserve their arguments that Plaintiffs' claims arise under federal law because federal law necessarily and exclusively governs claims seeking relief for harms allegedly stemming from interstate and international pollution; that they raise and depend on the resolution of disputed, substantial questions of federal

13

common law and are therefore removable under *Grable*; and that they arise out of or in connection with operations on the OCS and federal enclaves.

## ARGUMENT

### I.   These Actions Are Removable Under The Federal-Officer-Removal Statute.

The federal-officer-removal statute allows removal of suits brought against any person acting under a federal officer whenever the "civil action" is "for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).[6]  Federal officer removal is thus proper when (1) Defendants "'act[ed] under' federal officers," (2) "Plaintiffs' injuries were for or relating to Defendants' actions," and (3) Defendants "can assert a colorable federal defense."  *Honolulu II*, 39 F.4th at 1106.

The "Supreme Court has made clear that the [federal-officer-removal] statute must be liberally construed," and courts must "pay heed to [their] duty to interpret Section 1442 broadly in favor of removal." *Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244–45 (9th

---

[6] There is no dispute that Defendants are "persons" within the meaning of the federal-officer-removal statute.   *See Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 684 (9th Cir. 2022).

Cir. 2017) (cleaned up). Indeed, "[d]efendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014). Allegations "in support of removal" need only be "facially plausible," and defendants must be given the "benefit of all reasonable inferences from the facts alleged." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020). Moreover, courts are required to "credit the [defendants'] theory of the case for purposes of . . . [the] jurisdictional inquiry." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999). Defendants need not, at this point, prove that they will prevail on the merits of any federal issue because the sole issue is *where* such merits will be adjudicated. *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking Section 1442(a)(1) "need not win his case before he can have it removed").

Here, Plaintiffs seek relief for alleged physical injuries purportedly resulting, in part, from actions that Defendants took under the direction, guidance, and control of federal officers. Under the applicable liberal

15

pleading standards, Defendants have established that their actions under federal officers relate to Plaintiffs' alleged injuries, and they have pleaded colorable federal defenses.

The district court, however, assumed that *San Mateo II* and *Honolulu II* required it to remand these suits to state court. That was incorrect. Defendants have raised grounds for satisfying federal officer removal that were not before the *San Mateo II* Court and that the *Honolulu II* Court—which rejected jurisdiction based on the absence of a colorable federal defense—never addressed.

## A. Defendants Acted Under The Direction Of Federal Officers.

"The words 'acting under' are broad." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007). While "simply *complying* with the law" is not enough, the "acting under" requirement is satisfied when a defendant engages in an "effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior," such as when the contractor "help[s] officers fulfill . . . basic governmental tasks" or "help[s] the Government to produce an item that it needs." *Id.* at 152–53. Such "basic governmental tasks" include

16

those jobs that, "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153–54. The wartime provision of military supplies is a "classic case" of "when [a] private contractor acted under a federal officer or agency because the contractors helped the Government to produce an item that it needed." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (cleaned up); *see also Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 n.3 (1st Cir. 2022) ("Courts have consistently held that the 'acting under' requirement is easily satisfied where a federal contractor removes a case involving injuries arising from a product manufactured for the government.").

Defendants have demonstrated that they acted under federal officers in two crucial ways: (1) producing specialized fuels for the military, and (2) acting under the direction of the federal government during World War II.[7] This Court has not resolved whether those activities satisfy the "acting under" prong. *See Honolulu II*, 39 F.4th at 1107. The

---

[7] Defendants also presented four other ways that they acted under federal officers: Outer Continental Shelf leases and Bureau of Land Management onshore leases of mineral rights on federal land; activities at the Elk Hills Petroleum Reserve; activities during the Korean War; and activities involving the Strategic Petroleum Reserve. 1-ER-12. This Court

answer is yes: Both of those actions independently establish that Defendants acted under federal officers.

### 1. Defendants acted under federal officers to produce and supply specialized fuels for the military.

Federal officer removal is appropriate when the government "require[s]" a defendant to manufacture contracted products "according to detailed federal specifications." *Baker*, 962 F.3d at 940, 945; *see also Moore*, 25 F.4th at 35 n.3. Defendants here have done just that, developing and providing specialized fuels to the military under government control and direction.[8]

**a.** For decades, Defendants have produced and supplied large quantities of specialized fuels in conformity with exact military specifications to meet the unique operational needs of the military's planes, ships, and other vehicles. *See*, *e.g.*, 2-ER-55; 4-ER-815–17. Some specifications

---

in *San Mateo II* and *Honolulu II*, however, rejected those bases for federal officer removal. *Id*. Defendants respectfully preserve these arguments for further review.

[8] The complaints improperly conflate the activities of Defendants with those of their predecessors, subsidiaries, and affiliates. *See*, *e.g.*, 5-ER-1082–84 ¶¶ 33–37; 6-ER-1262–64 ¶¶ 33–37. Defendants reject these attributions, but describe the conduct of certain predecessors, subsidiaries, and affiliates to show that the complaints, as pleaded, should remain in federal court.

span dozens of pages. *See*, *e.g.*, 3-ER-563–84; 3-ER-586–604; 4-ER-607–649. And Defendants continue to supply large quantities of highly specialized fuels that must conform to precise Department of Defense ("DOD") specifications to meet the unique operational needs of the U.S. military. Professor Wilson[9] has explained that "[b]y 2010, the U.S. military remained the world's biggest single purchaser and consumer of petroleum products," and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels." 4-ER-823. "[I]n the absence of . . . [these] contract[s] with [Defendants], the Government itself would have had to perform" these essential tasks to meet the critical DOD fuel demands. *Baker*, 962 F.3d at 942.

For example, during the Cold War, Shell Oil Company developed and produced specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs. *See* 2-ER-179–218. For the U-2, it produced fuel known as

---

[9] Professor Mark R. Wilson, Ph.D., is a history professor at the University of North Carolina at Charlotte and is an "authority on the history of U.S. military-industrial relations." 4-ER-782. Professor Wilson provides, in an unrebutted expert declaration, an "overview of the history of U.S. government relations with the oil industry." 4-ER-782.

19

JP-7, which required special processes and a high boiling point to ensure the fuel could perform at very high altitudes and speeds. 2-ER-184. And "the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge," and "[a] new fuel and a chemical lubricant had to be developed to meet the temperature requirements." 2-ER-214. For the OXCART program, Shell Oil Company produced millions of gallons of specialized fuel under contracts with specific testing, inspection, labeling, and security requirements. *See* 2-ER-219–306; 3-ER-308–447. It also constructed "special fuel facilities" for handling and storage, including pipelines and storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts. 2-ER-233. In supplying such specialized fuel and facilities, Shell Oil Company acted under federal officers. *See*, *e.g.*, 2-ER-233. ("This work is under the technical direction of Colonel H. Wilson[.]").

Similarly, BP entities provided about 1.5 billion gallons of specialized military fuels for the DOD's use in *the four years from 2016 to 2020 alone*. 3-ER-454. These fuels include JP-5, JP-8, and F-76, together with

20

fuels containing specialized additives, including fuel system icing inhibitor ("FSII"), corrosion inhibitor/lubricity improver ("CI/LI") and, for F-76 fuels, lubricity improver additive ("LIA"). 3-ER-448–54. Such additives are essential to support the high performance of the military engines they fueled. FSII is required to prevent freezing caused by the fuels' natural water content when military jets operate at ultra-high altitudes, which can potentially lead to engine flameout, while CI/LI and LIA are used to avoid engine seizures and to ensure fuel handling system integrity when military fuels are stored for long periods, as on aircraft carriers. *See* 3-ER-471–561. And from at least 2010 to 2013, Shell Oil Company or its affiliates entered into billion-dollar contracts to supply specialized JP-5 and JP-8 military jet fuel. *See* 4-ER-650–762. The DOD's detailed specifications require that these fuels "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" with "military unique additives that are required by military weapon systems." 3-ER-460, -465, §§ 3.1, 6.1; 4-ER-768, -774, §§ 3.1, 6.1.

If the United States did not obtain oil and gas from the oil industry for military purposes, it would have had to produce the specialized fuel

on its own.  For federal officers, ensuring the national defense is a constitutional requirement, not a discretionary option.  *See The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862).  After December 7, 1941, the U.S. government had no practical alternative but to obtain oil to fuel the war against the Axis Powers.  It could have nationalized the oil industry to do so, as is common in many other countries.  *See* 4-ER-794.  Instead, it largely relied on industry to "fulfill a basic governmental task, under the government's control or subjection, that the government would otherwise have to perform itself."  *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 301–02 (4th Cir. 2022).

Similarly, before the age of spy satellites, the U.S. government needed to fuel specialized reconnaissance planes in order to monitor Soviet activities.  *Cf.* Serhii Plokhy, *Nuclear Folly: A History of the Cuban Missile Crisis* 129–31 (2021) (explaining how a pause in U-2 overflights of Cuba allowed the Soviet Union to construct nuclear missile bases undetected).  In the absence of private industry producing specialized fuels for these reconnaissance planes, the government would have had to find a way to fuel the national defense itself.

As two former Chairmen of the Joint Chiefs of Staff explained, "to achieve its paramount goal of protecting our national security, the military demands highly specialized fuels . . . . The [U.S.] military has not, and does not, have the knowledge or experience to produce these specialized products on its own. It relies on the private companies, many of which are Defendants in these lawsuits, to manufacture these fuels. Given the vital importance of these fuels, the military has, and continues to, closely direct and supervise these private parties and demands that the fuels meet the exact specifications required for military operations." Amici Br. of General R. Myers & Admiral M. Mullen, at 21–22, *City & Cnty. of Honolulu v. Sunoco LP*, No. 21-15313, Dkt. 49 (9th Cir. July 26, 2021). This is exactly the type of conduct that satisfies the "acting under" requirement.

These unique fuels are designed for military use and thus fall into the category of specialized military products that support federal jurisdiction. *See Watson*, 551 U.S. at 154 ("providing the Government with a product that it used to help conduct a war" supports removal). "[I]n the absence of . . . [these] contract[s] with [the Defendants], the Government

itself would have had to perform" these essential tasks to meet the critical DOD fuel demands. *Baker*, 962 F.3d at 942 (quoting *Watson*, 551 U.S. at 154); *see also Agyin v. Razmzan*, 986 F.3d 168, 175 (2d Cir. 2021) ("[A] private company acting pursuant to a contract with the federal government has this [federal-officer] relationship."). These federally directed activities therefore satisfy the acting-under prong of federal officer removal.

**b.** The district court below recognized that this Court has not confronted the question whether the manufacture of these specialized fuels qualifies as an act taken under federal officers. 1-ER-14. Yet the court still concluded that these activities did not meet the "acting under" standard, reasoning that Defendants' theory was similar to one that this Court rejected in *San Mateo II* involving CITGO's fuel-supply agreements with the Navy Exchange Service Command ("NEXCOM"). *See* 1-ER-14–15.

The analogy, however, is flawed. This Court in *San Mateo II* concluded that the NEXCOM contracts "evince[d] an arm's-length business relationship to supply NEXCOM with generally available commercial products." 32 F.4th at 758. CITGO sold ordinary gasoline and diesel to NEXCOM for resale to service members through service stations on Navy

24

installations.  *Id.*  That conventional business relationship to supply a generally available commercial product is leagues away from Defendants' production of specialized fuels here that even the district court acknowledged are "arguably not generally commercially available" and are "specially designed for the requirements" of unique U.S. military needs.  1-ER-15.  Defendants' production and supply of bespoke fuel products in conformity with detailed military specifications is the archetypal example of contractors working under federal officers.  *See Baker*, 962 F.3d at 943.

The district court also erroneously assumed that federal contractors cannot satisfy the acting-under prong unless they "risked criminal prosecution" for "fail[ing] to supply" the product to the government.  1-ER-15 (citing *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998), *overruled on other grounds by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020)).  But nothing in *Winters*, *San Mateo II*, or *Honolulu II* suggests that the threat of criminal prosecution—or any penalty for that matter—is required to satisfy the "acting under" test.

To the contrary, *San Mateo II* never even mentioned the risk of criminal sanctions in its description of *Winters*.  Rather, this Court noted

that the Supreme Court in *Watson* approvingly cited *Winters*, "which held that a government contractor could remove a state action under § 1442(a) because the contractor was acting on behalf of the government to produce Agent Orange," and the government "had provided detailed specifications" about the product. *San Mateo II*, 32 F.4th at 757. Additionally, the contractor in *Winters* "provided a product that was used to help conduct a war and at least arguably performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* (cleaned up); *see also Watson*, 551 U.S. at 153–54 (citing *Winters* approvingly).

Nor is the risk of criminal sanctions—or even civil penalty—a recognized requirement for federal officer removal under Ninth Circuit case law. *See*, *e.g.*, *Leite*, 749 F.3d at 1124 (affirming removal where defendant acted "under the direction of the Navy" without threat of criminal or civil penalty); *Goncalves*, 865 F.3d at 1245 (same).

The same rationale applies here. Thus, the specialized fuels that Defendants manufacture for the U.S. military satisfy the "acting under" prong. The district court erred in concluding otherwise.

26

### 2. Defendants acted under federal officers during World War II.

The federal government also exerted comprehensive control over Defendants, including their predecessors and affiliates, during World War II by fundamentally reshaping the industry to guarantee the production and availability of fuel supplies for wartime efforts. These activities independently satisfy the acting-under prong.

**a.** Federal control of the industry during World War II was pervasive. "The government not only directed and controlled production, but also financed and owned a substantial proportion of the industry's productive capacity." 4-ER-791. As Senator O'Mahoney, Chairman of the Special Committee Investigating Petroleum Resources, put it in 1945, "[n]o one who knows even the slightest bit about what the petroleum industry contributed to the war can fail to understand that it was, without the slightest doubt, one of the most effective *arms of this Government* . . . in bringing about a victory." 2-ER-34 (emphasis added). And as two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'"

27

spans "more than a century," and during their tenure, petroleum products were "crucial to the success of the armed forces." 2-ER-118–19.

Multiple courts have found that the federal government exerted pervasive control over Defendants during World War II to ensure the supply of fuel, such as high-octane aviation fuel known as "avgas." "Because avgas was critical to the war effort, the United States government exercised significant control over the means of its production during World War II." *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002). The "federal government directed the owners and operators of the [N]ation's crude oil refineries"—including predecessor companies of Defendants—"to convert their operations" in order to produce avgas and other products that "the military desperately needed." *Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *30 (S.D. Tex. Sept. 16, 2020); *see also id.* at *14 ("The government . . . used [its] authority to control many aspects of the refining process and operations."). In so doing, the federal government "insist[ed] that each company utilize[] all of its facilities to make 100 octane aviation gasoline to the extent of its ability to so do, and there [wa]s not in fact any freedom to make a choice between contracting and not contracting." *Id.* at *12.

28

These cases show the nature and extent of federal control exerted through agencies such as the Petroleum Administration for War ("PAW"), a federal agency established during World War II to regulate fossil-fuel usage in support of the war effort. PAW directed construction of new oil exploration and manufacturing facilities, issued production orders, entered into contracts with private oil-and-gas companies giving federal officers extraordinary control over quality and quantity of production, and "programmed operations to meet new demands, changed conditions, and emergencies." U.S. Petroleum Administration for War, *Petroleum in War and Peace: Papers Presented by the Petroleum Administration for War Before the United States Senate Special Committee to Investigate Petroleum Resources* 8 (1945), https://bit.ly/3JTUqeF.[10] For example, the government built "dozens of large government-owned industrial plants" that were "managed by private companies under government direction." 4-ER-796. "The U.S. government enlisted oil companies to operate government-owned industrial equipment." 4-ER-797. Among the largest facilities was a refinery site in Richmond, California, operated by Socal (a

---

[10] The Court may take judicial notice of government records. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010).

Chevron predecessor), which was "the second-largest of all the facilities focused on [avgas] production, providing 10 percent of total global output of" avgas by 1945. 4-ER-803–04.

In short, PAW "told the refiners what to make, how much of it to make, and what quality." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1286 (Fed. Cir. 2014) (citation omitted). PAW also issued directives to refineries to "run their production operations on a continuous basis and to minimize downtime for maintenance and repair" in order "[t]o ensure maximum production." *Exxon Mobil*, 2020 WL 5573048, at *12. Those "extraordinary modes of operation" were "often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts." *Shell Oil*, 751 F.3d at 1287 (citation omitted).

When directing the production of aviation gas and other essential military products, PAW coordinated the activities of all energy companies as if the companies were "units of one enterprise and directed their operations so as to produce the maximum quantities of aviation gasoline at the earliest possible time." *Exxon Mobil*, 2020 WL 5573048, at *12 (citation omitted). The Administration would "quit allocating crude oil to those that [did not] devote themselves to what [it] called the war effort."

30

*Id*.  Companies that were not "making essential war materials" were simply unable to run their refineries.  *Id*. (citation omitted).

As Professor Wilson explained in his unrebutted declaration, "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them."  4-ER-793; *see also* 2-ER-28–39, -152–56.  "Some directives restricted the use of certain petroleum products for high-priority war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines."  4-ER-793.  PAW's directives to Defendants were mandatory and enforceable by law.  *Exxon Mobil*, 2020 WL 5573048, at *11 (finding that private refiners had "no choice" but to comply with federal direction); *see also* 2-ER-176 (listing "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance").  Its message to the energy industry was clear:  The government would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way."  2-ER-174.

Defendants further acted under the federal government as its agents in building and operating pipelines to transport oil during World

31

War II. "To insure adequate supplies of petroleum through the east during" the war, the government "caused to be constructed, between [certain] Texas oilfields and the Atlantic seaboard, two large pipelines." *Schmitt v. War Emer. Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949). An entity that included predecessors or affiliates of Defendants constructed and operated the two lines "under contracts" and "as agent" for the federal government "without fee or profit." *Id*. at 335–36. The government had the power to "direct such affirmative action as may be necessary to accomplish the purposes" of the two lines—namely, "relieving shortages" and "augmenting supplies for offshore shipments." 8 Fed. Reg. 13,343 (Sept. 30, 1943) (Petroleum Directive 73). Through certain federal directives, the government controlled all oil that moved through the pipelines on the government's behalf. *See* 8 Fed. Reg. 1,068–69 (Jan. 20, 1943) (Petroleum Directive 63); *see also* 2-ER-140–41; 2-ER-149–51; 2-ER-161–62. The government "delegate[ed] operating function" to Defendants, which operated as the government's "agent[s] to manage, operate and maintain the pipe lines." *Schmitt v. War Emer. Pipelines, Inc.*, 72 F. Supp. 156, 158 (E.D. Ark. 1947), *aff'd*, 175 F.2d 335 (8th Cir. 1949). And "delegation"

32

and "principal/agent arrangement[s]" are quintessential relationships permitting federal officer removal. *Watson*, 551 U.S. at 156.

**b.** The district court, in evaluating all of this evidence, noted that, "if we were writing on a clean slate, all of the evidence discussed above would present a colorable showing that defendants' activities during the Second World War were highly regulated such that it would meet the statutory standard for removal." 1-ER-14. But the court assumed that it was bound to reject federal officer removal by this Court's holding in *San Mateo II* that "a person's *compliance* with the law (or *acquiescence* to an order) [does not] amount to 'acting under' a federal official who is giving an order or enforcing the law[,] . . . even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." 1-ER-14.

The district court, however, erroneously overlooked this Court's instruction that "a private party acts under the government when the party is a contractor given detailed specifications and ongoing supervision to help fight a war." *Honolulu II*, 39 F.4th at 1107. This principle applies with full force to Defendants' activities under federal officers during World War II. *See*, *e.g.*, *Watson*, 551 U.S. at 154 (highlighting as "acting

under" the provision to the Government of "a product that it used to help conduct a war" and "that, in the absence of a contract with a private firm, the Government itself would have had to [produce]"); *Baker*, 962 F.3d at 942 (affirming removal in the "wartime context").

## B. Defendants' federal activities "relat[e] to" Plaintiffs' lawsuits.

The federal-officer-removal statute also requires that the plaintiff's lawsuit be "for or relating to" the defendant's federally directed action. 28 U.S.C. § 1442(a)(1). This, however, is not a heavy burden. In 2011, Congress amended the statutory text to permit removal even of lawsuits that merely "relat[e] to" a federally directed action. Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545. The amendment thus "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais*, 951 F.3d at 292; *see also*, *e.g.*, *Baker*, 962 F.3d at 943–44; *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017); *In re Commonwealth's Mot. to Appoint Counsel*, 790 F.3d 457, 471 (3d Cir. 2015). Defendants have more than cleared that low hurdle.

34

According to Plaintiffs, Defendants' worldwide supply of fossil fuels—which necessarily encompasses the activities taken at federal direction discussed above—allegedly caused physical injuries to Plaintiffs. *See* 5-ER-1088–89, -1101–05 ¶¶ 52–55, 84–92; 6-ER-1268–69, -1283–89 ¶¶ 53–56, 85–93. While Defendants dispute Plaintiffs' allegations, a defendant need not admit causation in order to secure removal. *See*, *e.g.*, *Maryland v. Soper*, 270 U.S. 9, 32–33 (1926).

The district court nevertheless held that Defendants were not entitled to remove this case on federal-officer grounds because the World War II activities that Defendants pointed to occurred before "[t]he alleged deceptive promotion" campaign. 1-ER-14.

The court's analysis was erroneous. In this inquiry, a court must examine how and when the plaintiff's alleged "injury occurred." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012). Accordingly, the court should have focused not on particular alleged acts that Plaintiffs chose to emphasize in their briefing, but instead on the acts that allegedly caused Plaintiffs' "'injuries'" and on the "harm" that allegedly gave rise to the "damages" that Plaintiffs seek to recover. *Cnty. Bd. of Arlington Cnty. v.*

*Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251–52, 257 (4th Cir. 2021).

That is the same analysis that courts apply to a wide range of jurisdictional inquiries. For example, the Supreme Court has explained that, when assessing the nature of a plaintiff's claims for jurisdictional purposes, courts must "zero[] in on the core of the[] suit," especially the "acts that actually injured" the plaintiff. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015); *see also*, *e.g.*, *id.* at 36 ("[T]he 'essentials' of a personal injury narrative will be found at the 'point of contact'—'the place where the boy got his fingers pinched.'"); *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1222 (11th Cir. 2018) (focusing on the "'acts that actually injured' the plaintiff" as "the 'core' of the suit"). That focus is essential because "any other approach would allow plaintiffs to evade" jurisdictional requirements "through artful pleading." *OBB Personenverkehr*, 577 U.S. at 36; *see also Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017). Rather, the court must "credit [the defendant's] theory of the case." *Acker*, 527 U.S. at 432.

More than Defendants' theory, Plaintiffs' complaints themselves rely on a causal theory of Defendants' "cumulative production of fossil

36

fuels" being the "primary source of the greenhouse gas pollution that causes global warming" that purportedly caused Plaintiffs' alleged injuries. 5-ER-1075, -77–78 ¶¶ 2, 10; 6-ER-1187, -90 ¶¶ 2, 10. Plaintiffs' complaints thus seek to hold Defendants liable for their exploration, extraction, and production of oil and gas, including their substantial activities at the behest of federal officers, which Plaintiffs allege "will intensify future warming and exacerbate [Plaintiffs'] injuries from sea level rise." 5-ER-1088 ¶ 54; 6-ER-1202 ¶ 55. As a result, Plaintiffs' suits necessarily relate to Defendants' production of fossil-fuel products (including the substantial portion produced under federal direction), because that production is an essential element of Plaintiffs' alleged chain of causation that leads to their purported injuries. Indeed, the complaints make clear— and Plaintiffs cannot dispute—that without the production of fossil fuel, Plaintiffs would not have suffered their alleged injuries and would have no basis for bringing these lawsuits. For these reasons, Plaintiffs themselves acknowledged to the district court that "the primary conduct" of concern in *Oakland* and *San Francisco* is less deception than "the production of fossil fuels." 4-ER-879; *see also* 5-ER-885 (asserting that "the

primary conduct giving rise to liability remains defendants' production and sale of fossil fuels").[11]

Plaintiffs' requested relief confirms that their claims relate to Defendants' production and sale of oil and gas. Plaintiffs seek relief for harms allegedly caused by worldwide production and sales activities. If Plaintiffs' claims related only to alleged misrepresentations, the requested relief would be limited to—at most—any harms resulting from the purported marginal increase in fossil-fuel consumption caused by the asserted concealment and misrepresentations. But their complaints expressly identify Defendants' extraction, production, and sale of fossil fuels as the direct cause of all of their alleged harms. And Plaintiffs do not even pretend to impose a limit on their requested damages, instead

---

[11] The district court dismissed these statements because they involved the amended complaint rather than the initial complaint. 1-ER-8 n.2. But the complaints are not materially different and, significantly, both allege that the "[p]roduction of fossil fuels," not any supposed misstatements, causes "global warming." *Compare* 5-ER-1084 ¶ 38, *with* 5-ER-913 ¶ 74 (*Oakland* amended complaint). In fact, the amended complaint contained *more* allegations regarding misrepresentations and deception than the initial complaint, *see* 5-ER-919–21, 923 ¶¶ 94–95, 99–100; 5-ER-986–88, 990–91 ¶¶ 94–95, 99–100, so Plaintiff's concessions apply all the more to the initial complaint. The district court should have accepted these crucial admissions.

seeking an "abatement fund" from Defendants to be able to adapt to *all* "global warming impacts."  5-ER-1107; 6-ER-1291.  A case based solely on deception would look quite different.  Indeed, in a normal consumer-fraud claim, a plaintiff seeks as its damages the purchase price (or some portion thereof) for fossil fuels it consumed (or its residents consumed) due to a misrepresentation, absent which it either would not have made those purchases or would have paid less.  That is not even close to what Plaintiffs seek here.

The fact that Plaintiffs' complaints also mention alleged misstatements made by Defendants is irrelevant to the federal-officer-removal inquiry.  As the Second Circuit noted in nearly identical circumstances, such allegations "do[] not change the substance of [Plaintiffs'] claims." *City of New York v. Chevron Corp.*, 993 F.3d 81, 97 (2d Cir. 2021) (describing "the City's focus on [an] 'earlier moment' in the global warming lifecycle [as] merely artful pleading").  Indeed, Plaintiffs allege that the "purpose and effect" of these alleged misstatements "has been to help Defendants continue to *produce* fossil fuels and sell their products on a massive scale."  5-ER-1095 ¶ 63 (emphasis added); 6-ER-1209 ¶ 64 (emphasis added).  In other words, the alleged misstatements matter only insofar

as they allegedly enabled Defendants to produce greater amounts of oil and gas, the combustion of which released greenhouse gas emissions that purportedly caused Plaintiffs' alleged injuries. Defendants' production activities thus remain at the very core of Plaintiffs' claims. This is more than sufficient for federal officer removal. As the Seventh Circuit held in *Baker*, for purposes of federal officer removal, all that is required is that "a small, yet *significant*, portion of [defendants'] relevant conduct" be for or related to federal authority. 962 F.3d at 945. In similar fashion, the Fourth Circuit held in *Express Scripts* that removal was proper even though only a fraction of the opioids supplied by the defendants that allegedly caused a public nuisance were supplied under federal direction or control. 996 F.3d at 257. The same result is warranted here.

In short, Plaintiffs' complaints seek to recover based on Defendants' production of oil and gas. And thus Defendants' production of fossil fuels—including their specialized fuel contracts and service during World War II—necessarily relates to those claims.

### C.   Defendants Raise "Colorable Federal Defenses."

Finally, Defendants have raised numerous colorable federal defenses.  As the Supreme Court has explained, "[i]n construing the colorable federal defense requirement, we have rejected a 'narrow, grudging interpretation' of the statute, recognizing that 'one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court.'"  *Acker*, 527 U.S. at 431.  As a result, courts "do not require the officer virtually to 'win his case before he can have it removed.'"  *Id.*  So long as a defense is not frivolous, it satisfies the colorable-federal-defense prong.  *Cf. McBridge Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 981 (9th Cir. 2002) ("A colorable claim is one which is not 'wholly insubstantial, immaterial, or frivolous.'").  The defenses asserted in the notices of removal certainly are not frivolous.

Defendants' notices of removal asserted the existence of numerous meritorious federal defenses, in particular the government-contractor immunity defense.[12]  This Court in *Honolulu II* held that defense was not

---

[12]  The *Honolulu II* Court also rejected Defendants' federal defenses based on the First Amendment, due process, Interstate and Foreign Commerce Clauses, the foreign-affairs doctrine, and preemption because the Court

colorable because the defendants did not cite any cases that involved "failure to warn claims." 39 F.4th at 1110. But that holding is inapplicable here because—unlike either *Honolulu II* or *San Mateo II*— this case *does not involve* a failure-to-warn claim. Rather, Plaintiffs have brought only a single cause of action—public nuisance, which they allege was caused by "Defendants' cumulative production of fossil fuels over many years," 5-ER-1077 ¶ 10; 6-ER-1257 ¶ 10. And courts have applied the government-contractor defense in cases where the plaintiff brings a nuisance claim. *See*, *e.g.*, *Express Scripts*, 996 F.3d at 254–56 (applying government-contractor defense to claims including public nuisance and concluding that removal under federal officer statute was appropriate); *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *7 (N.D. Ohio Jan. 12, 2023) (applying government-contractor defense to claims including public nuisance and denying the motion to remand); *cf. Minnesota v. Am. Petroleum Inst.*, --- F.4th ---, No. 21-1752, 2023 WL

---

concluded that they did not arise from official duties. 39 F.4th at 1110. This ruling is the subject of a pending petition for a writ of certiorari. *See Sunoco LP v. City & Cnty. of Honolulu*, No. 22-523 (U.S.). Defendants respectfully preserve their argument that the *Honolulu II* Court erred in this conclusion.

2607545, at *7 n.11 (8th Cir. May 23, 2023) (stating that "a nuisance claim creates a stronger case for federal jurisdiction" in evaluating similar arguments).

The *Honolulu II* Court also rejected the government-contractor defense because the defendants in that case presented only "conclusory statements and general propositions of law," rather than presenting a complete articulation of the argument. 39 F.4th at 1110. Here, however, drawing on the factual allegations in Defendants' notices of removal and subsequent filings supporting their oppositions to remand, Defendants have made a "colorable" case for the government-contractor defense.

To establish a government-contractor defense, a defendant must demonstrate that "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about [any] dangers in the use of the equipment that were known to the supplier but not to the United States." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 731 (9th Cir. 2015) (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)). To satisfy the first prong, "a contractor must demonstrate that the government approved reasonably precise specifications" and did

43

more than rubberstamp the design. *Gertz v. Boeing Co.*, 654 F.3d 852, 861 (9th Cir. 2011) (internal quotations marks omitted). And the third prong can be satisfied when the federal government is "already aware of [a] particular risk." *Id.* at 865.

Defendants here have submitted evidence colorably establishing each of these prongs. First, as demonstrated at length above, *see supra* at 18–24, Defendants submitted evidence showing that the U.S. government ordered—and continues to order—military-grade fuels from Defendants with exacting specifications for the U.S. military. *See* 2-ER-58–59. Second, Defendants submitted evidence demonstrating that they followed these instructions, producing highly specialized, noncommercial fuel for the military that conforms to the government's exacting specifications. *See id.*; *see also supra* at 18–24.

As for the third prong, the government has been aware of the risks of using oil and gas for decades, yet—as the continued production of specialized military fuels demonstrates—it has continued to order substantial amounts of fuel from Defendants. Since at least the 1950s, federal lawmakers have been informed of the potential climatic effects of burning fossil fuels and emitting greenhouse gases. For example, in 1956, Dr.

44

Roger Revelle, a leading U.S. scientist, testified before the U.S. House Appropriations Subcommittee that "[b]ased on figures given out by the United Nations[,] . . . by the year 2010, we will have added something like 70 percent of the present atmospheric carbon dioxide to the atmosphere. This is an enormous quantity. . . . [I]t may, in fact, cause a remarkable change in climate." Second Supplemental Appropriation Bill: Hearing on H. Doc. 330 Before the Subcomm. of the Comm. on Appropriations, 84th Cong. 472–73 (1956).

The next year, Dr. Revelle again testified before the Subcommittee, observing that: "More or less, in spite of ourselves, we are adding carbon dioxide to the atmosphere in large quantities." National Science Foundation: Review of First Eleven Months of International Geophysical Year: Hearings Before the Subcomm. of the Comm. on Appropriations, 85th Cong. 75 (1958). In all, the U.S. Congress has directed intense and extended focus to climate change, holding 246 Congressional hearings on the topic involving 1,595 congressional testimonies between just 1976 and 2007. *See* Hyung Sam Park et al., *Framing Climate Policy Debates: Science, Network, and U.S. Congress, 1976-2007*, at 5 (2010), https://bit.ly/3LZSLa0. Indeed, the U.S. Supreme Court has observed

45

that the federal government began devoting particularly serious attention to climate change policy by the "late 1970's." *Massachusetts v. EPA*, 549 U.S. 497, 507 (2007).

Likewise, the Executive Branch has been aware of the potential effects of greenhouse-gas emissions for decades. For example, in 1965, President Lyndon B. Johnson announced "a steady increase in carbon dioxide from the burning of fossil fuels." President Lyndon Baines Johnson, *Special Message to the Congress of Conservation and Restoration of Natural Beauty*, Feb. 8, 1965, The American Presidency Project, https://bit.ly/40OYALK. That same year, President Johnson's Science Advisory Committee reported that "[b]y the year 2000 the increase in atmospheric $CO_2$ will be close to 25%" and may be "sufficient to produce measurable and perhaps marked changes in climate," including "almost certainly caus[ing] significant changes in the temperature and other properties of the stratosphere." The White House, *Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel*, President's Sci. Advisory Comm. 112, 126–27 (1965).

Based on these facts, Defendants have more than satisfied their minimal burden of demonstrating that their government-contractor defense is colorable, thus satisfying this last prong for removal jurisdiction.

## II. These Actions Are Removable Because Plaintiffs' Claims Necessarily Raise Disputed And Substantial Issues Under The First Amendment.

Separately, to the extent that Plaintiffs' complaints involve allegations that Defendants engaged in misrepresentations, those claims are removable under the Supreme Court's decision in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), because they necessarily incorporate federal elements imposed by the First Amendment.

Under *Grable*, lawsuits alleging state-law causes of action may still "aris[e] under" federal law if they require resolution of substantial, disputed federal questions, thereby justifying removal. *See* 545 U.S. at 313–14. The Supreme Court has "recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Id*. at 312. The doctrine applies where the federal issue is "(1) necessarily raised, (2) actually disputed,

(3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

Even if this Court were to construe Plaintiffs' claims as based solely on alleged misrepresentations about the effect of Defendants' oil-and-gas products, those claims still would arise under federal law for purposes of *Grable* jurisdiction because they necessarily incorporate affirmative federal constitutional elements imposed by the First Amendment. Plaintiffs cannot prevail without demonstrating that the alleged misrepresentations satisfy those mandatory federal-law prerequisites for liability.

Plaintiffs argue that their claims turn on promotion and alleged misrepresentation—*i.e.*, Defendants' alleged advertising, advocacy, and lobbying communications. These sorts of activities are presumptively protected by the First Amendment. The claims in this case thus "involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law." *Grable*, 545 U.S. at 313 (alterations in original).

The Supreme Court has made clear that where nominally state-law tort claims target speech on matters of public concern like climate change, the First Amendment injects affirmative federal-law elements

48

into the plaintiff's cause of action, obligating the plaintiff to prove federally mandated elements such as factual falsity, actual malice, and causation of actual damages. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774–76 (1986) (state common-law standards include "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 285–86 (1964) (public officials have burden of proving with "convincing clarity" that "statement was made with 'actual malice'"); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").

These federal issues are not "defenses," but constitutionally required *elements* of the plaintiff's cause of action, for which the *plaintiff* "bear[s]" the burden of proof—by clear and convincing evidence—*as a matter of federal law*. *See Hepps*, 475 U.S. at 774–76; *Sullivan*, 376 U.S. at 279–80, 285–86 (plaintiff public officials bear burden of proving with "convincing clarity" that "statement was made with 'actual malice'"). And this requirement extends outside of the defamation context to a wide

49

range of state-law tort causes of action. *See Time Inc. v. Hill*, 385 U.S. 374, 390 (1967) (requiring proof of actual malice to make out a claim for false-light form of invasion of privacy); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 53, 56 (1988) (extending First Amendment requirements beyond defamation context); *Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009) (similar), *aff'd*, 562 U.S. 443 (2011); *see also U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 931 (3d Cir. 1990) ("we do not limit our consideration of the applicability of the *New York Times* standard to the parties' claims for defamation alone"); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326–27 (S.D.N.Y. 2006) ("Negligent misrepresentation claims and other actions based on a defendant's allegedly false speech must be reconciled with the First Amendment[.]"), *aff'd*, 279 F. App'x 40 (2d Cir. 2008); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 811 (S.D. Tex. 2005) ("First Amendment protections and the actual malice standard . . . have been expanded to reach beyond their traditional application to the law of defamation, slander and libel to reach other causes of action, e.g., breach of contract, misrepresentation, and tortious interference with contract or business." (collecting cases)).

As a result, to the extent that Plaintiffs' claims involve allegations of misrepresentation, that provides an independent basis for federal jurisdiction under *Grable*. The constitutional-proof requirements for speech-related claims are "essential" elements of Plaintiffs' claims, and Defendants' First Amendment rights will be "supported" or "defeated" depending on whether Plaintiffs meet their burden of proof on those federal elements of their claims. *Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936). Under Plaintiffs' stated causes of action, the court would have to address whether the First Amendment protects Defendants' speech on matters of public concern. When "a court will have to construe the United States Constitution" to decide Plaintiffs' claims, the claims "necessarily raise a stated federal issue" under *Grable*, and federal jurisdiction is proper. *See Ortiz v. Univ. of Med. & Dentistry of N.J.*, 2009 WL 737046, at *3 (D.N.J. Mar. 18, 2009) (denying plaintiff's motion to remand where his state-law claim depended on question whether a state entity impinged on his First Amendment right by retaliating against him for reporting information to that entity).

The district court below stated that, "[i]f promotion is now to be the crux of the public nuisance claim, then it will by definition involve commercial speech . . . and involve petition for redress of grievance," which are protected by the First Amendment. 1-ER-10. Nevertheless, the court assumed that it was bound by *San Mateo II* and *Honolulu II* to reject Defendants' *Grable* argument. *Id.* That was error. Neither *San Mateo II* nor *Honolulu II* addressed *Grable* in the First Amendment context. *See generally San Mateo II*, 32 F.4th at 746–48; *Honolulu II*, 39 F.4th at 1106–13.

The district court also rejected Defendants' argument that the First Amendment establishes an affirmative element of Plaintiffs' claim, relying on *Knievel v. ESPN*, 393 F.3d 1068, 1073 (9th Cir. 2005); *Lieberman v. Fieger*, 338 F.3d 1076, 1079 (9th Cir. 2003); and *Church of Scientology of Cal. v. Adams*, 584 F.2d 893, 899 (9th Cir. 1978). 1-ER-11. But those cases prove just the opposite. In *Knievel*, this Court held that the only way the plaintiff could survive a motion to dismiss was by demonstrating that the allegedly defamatory statements were *not* protected by the First Amendment. 393 F.3d at 1074 (holding that an affirmative element of plaintiff's defamation claim was showing that the allegedly defamatory

52

statements "are not mere comment within the ambit of the First Amendment"). In *Lieberman*, the Court held that the plaintiff had failed to allege facts demonstrating that the allegedly defamatory statements she challenged were not "statements of opinion on matters of public concern," and they were therefore protected by the First Amendment. *See generally* 338 F.3d at 1079–82. And the decision in *Adams* devotes hardly any analysis to the role that the First Amendment plays in nominally state-law causes of action, 584 F.2d at 899—and it certainly does not undermine the Supreme Court's repeated instructions that the First Amendment imposes an affirmative duty on plaintiffs. *See supra* at 48–51. Additionally, none of these cases considered the role that the First Amendment plays in the removal analysis.

To be sure, most state-law misrepresentation claims are not subject to removal under *Grable* because they are "not substantial in the relevant sense," in that they do not involve an issue of "importance . . . to the federal system as a whole." *Gunn*, 568 U.S. at 260. But unlike the vast majority of state-law tort cases involving speech, Plaintiffs' lawsuits are attempts by governmental entities to burden speech on matters of public

concern, which implicates the very core of the First Amendment's protections. "[C]limate change" is among the "controversial subjects" and "sensitive political topics" where freedom of speech "merits 'special protection.'" *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2476 (2018). Indeed, "[c]limate change has staked a place at the very center of this Nation's public discourse," and "its causes, extent, urgency, consequences, and the appropriate policies for addressing it" are "hotly debated." *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 347–48 (2019) (Alito, J., dissenting from denial of certiorari). Freedom of speech is "most seriously implicated . . . in cases involving disfavored speech on important political or social issues," including climate change, which is "one of the most important public issues of the day." *Id*. at 344, 346, 348 (noting that a federal forum is especially warranted in suits "concern[ing] a political or social issue that arouses intense feelings," because "a plaintiff may be able to bring suit in whichever jurisdiction seems likely to have the highest percentage of jurors who are sympathetic to the plaintiff's point of view").

Importantly, moreover, Plaintiffs are public entities seeking to use the machinery of their own state courts to impose government-mandated burdens on Defendants' nationwide speech on issues of national concern.

First Amendment interests are at their apex where, as here, a governmental entity seeks to use state law to regulate speech on issues of "public concern." *Hepps*, 475 U.S. at 775. Given the uniquely compelling federal interests at stake here, federal courts may entertain the claims at issue "without disturbing any congressionally approved balance of federal and state judicial responsibilities," making removal appropriate. *Grable*, 545 U.S. at 314.

As a result, to the extent that Plaintiffs' claims involve allegations of misrepresentation, that provides an independent basis for federal jurisdiction under *Grable*. The constitutional-proof requirements for speech-related claims are "essential" elements of Plaintiffs' claims, and Defendants' First Amendment rights will be "supported" or "defeated" depending on whether Plaintiffs meet their high burden of proof on those federal elements of their claims. *Gully*, 299 U.S. at 112. In such a case, the district court would have to address whether the First Amendment protects Defendants' speech on matters of public concern, thereby allowing *Grable* removal.

55

## III. Defendants Preserve Additional Arguments That Plaintiffs' Claims Arise Under Federal Law.

For purposes of potential further review, Defendants also respectfully preserve their arguments that have previously been rejected by panels of this Court, including that Plaintiffs' claims arise under federal law because federal law necessarily and exclusively governs claims seeking relief for harms allegedly stemming from interstate and international pollution. *See*, *e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981); *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 421–23 (2011). Plaintiffs' claims also raise and depend on the resolution of disputed, substantial federal questions for the same reasons, and relate to the federal government's exclusive control over foreign affairs and treaty interpretation involving international climate accords, as well as other issues of constitutional law under the Interstate and Foreign Commerce Clauses and Due Process Clause. The claims are therefore removable under *Grable*.

Finally, Plaintiffs' claims "aris[e] out of, or in connection with" operations on the OCS, 43 U.S.C. § 1349(b)(1), and are "based on injuries

arising from conduct on [federal] enclave[s]," *Honolulu II*, 39 F.4th at 1111.

## CONCLUSION

The Court should reverse the district court's remand order.

DATED: March 31, 2023

Respectfully submitted,

By:  /s/ *Dawn Sestito*
M. Randall Oppenheimer
Dawn Sestito
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
roppenheimer@omm.com
dsestito@omm.com

By: ** /s/ *Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.
William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
tboutrous@gibsondunn.com
wthomson@gibsondunn.com

Theodore V. Wells, Jr.
Daniel J. Toal
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dtoal@paulweiss.com

*Attorneys for Defendant-Appellant*
*EXXON MOBIL CORPORATION*

Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
thungar@gibsondunn.com

Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
aneuman@gibsondunn.com

Joshua D. Dick
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
jdick@gibsondunn.com

By:  /s/ *Gary T. Lafayette*
Gary T. Lafayette
LAFAYETTE KUMAGAI LLP
1300 Clay Street, Suite 810
Oakland, California 94612
Telephone: (415) 357-3600
Facsimile: (415) 357-4605
glafayette@lkclaw.com

David C. Frederick
Daniel S. Severson
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
dseverson@kellogghansen.com

*Attorneys for Defendant SHELL PLC*
*(F/K/A ROYAL DUTCH SHELL*
*PLC)*

Neal S. Manne
Johnny W. Carter
Erica Harris
Steven Shepard
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
nmanne@susmangodfrey.com
jcarter@susmangodfrey.com
eharris@susmangodfrey.com
sshepard@susmangodfrey.com

Herbert J. Stern
Joel M. Silverstein
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
Florham Park, NJ 07932-0992
Telephone: (973) 535-1900
Facsimile: (973) 535-9664
hstern@sgklaw.com
jsilverstein@sgklaw.com

*Attorneys for Defendant-Appellant*
*CHEVRON CORPORATION.*

** Pursuant to Ninth Circuit L.R. 25-5(e), counsel attests that all other parties on whose behalf the filing is submitted concur in the filing's contents.

59

By: _/s/ Raymond A. Cardozo_
Raymond A. Cardozo
T. Connor O'Carroll
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: (415) 543-8700
Facsimile: (415) 391-8269
rcardozo@reedsmith.com
cocarroll@reedsmith.com

Jameson R. Jones
Daniel R. Brody
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
jameson.jones@bartlitbeck.com
dan.brody@bartlitbeck.com

*Attorneys for Defendants-Appellants*
*CONOCOPHILLIPS COMPANY and*
*CONOCOPHILLIPS*

By: _/s/ Jonathan W. Hughes_
Jonathan W. Hughes
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th
Floor
San Francisco, California 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
jonathan.hughes@arnoldporter.com

John D. Lombardo
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
john.lombardo@arnoldporter.com

Nancy Milburn
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8383
Facsimile: (212) 715-1399
nancy.milburn@arnoldporter.com

*Attorneys for Defendant-Appellant BP*
*P.L.C.*

## STATEMENT OF RELATED CASES

Other than cases identified on the cover page of this brief, defendants are unaware of any related cases currently pending in this Court.

Dated: March 31, 2023

/s/ *Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Defendant-Appellant Chevron Corporation*

61

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that:

This brief complies with the length limits permitted by Ninth Circuit Rules 32-1(a) and 32-2(b). This brief contains 10,701 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and is filed by separately represented parties.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2016, Times New Roman 14-point font.

Dated: March 31, 2023   */s/ Theodore J. Boutrous, Jr.*
          Theodore J. Boutrous, Jr.

          GIBSON, DUNN & CRUTCHER LLP

          *Attorneys for Defendant-Appellant*
          *Chevron Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: March 31, 2023

/s/ *Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Defendant-Appellant Chevron Corporation*

63

# **ADDENDUM**

Pursuant to Ninth Circuit Rule 28-2.7, this addendum includes pertinent statutes, reproduced verbatim:

**Statute**                                                                                   **Page**

28 U.S.C. § 1291 ...................................................................... 65

28 U.S.C. § 1442(a) .................................................................. 65

28 U.S.C. § 1447(d) .................................................................. 66

43 U.S.C. § 1349(b) .................................................................. 66

## 28 U.S.C. § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 U.S.C. § 1442. Federal officers or agencies sued or prosecuted

(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1)   The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

(2)   A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

(3)   Any officer of the courts of the United States, for or relating to any act under color of office or in the performance of his duties;

(4)   Any officer of either House of Congress, for or relating to any act in the discharge of his official duty under an order of such House.

… .

65

## 28 U.S.C. § 1447. Procedure after removal generally

… .

(d) An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.

## 43 U.S.C. § 1349. Citizen suits, jurisdiction and judicial review

… .

(b) Jurisdiction and venue of actions

(1)   Except as provided in subsection (c) of this section, the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter.  Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose.

(2)   Any resident of the United States who is injured in any manner through the failure of any operator to comply with any rule, regulation, order, or permit issued pursuant to this subchapter may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district having jurisdiction under paragraph (1) of this subsection.

… .